IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:10-cr-51 |
| | ) | |
| -vs- | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER GRANTING DEFENDANT'S** |
| Manuel Quintero, | ) | **MOTION TO SUPPRESS** |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant Manuel Quintero's motion to suppress evidence seized from a warrantless hotel room search (Doc. #40). The United States filed a brief in opposition (Doc. #42). The Court, having considered all of the briefs and documents filed by the parties as well as the evidence and arguments presented at the July 28, 2010 hearing, now issues this memorandum opinion and order.

## SUMMARY OF DECISION

The Court, having weighed all of the evidence, finds Michelle Quintero impliedly consented to the law enforcement officers' entry into her and her husband's hotel room, but did not voluntarily consent to a search of the room. Accordingly, Defendant's motion to suppress evidence is **GRANTED**.

## FACTUAL BACKGROUND

On September 15, 2009, security officers for Dakota Magic Casino and Hotel in Hankinson, North Dakota (hereafter "the hotel") contacted the Richland County Sheriff's Office to report a light bulb located in Room 108 that they believed appeared to be used as a smoking device for narcotics. Manuel Quintero (hereafter "Manuel") had been the registered guest in the room. Co-Defendant Michelle Quintero (hereafter "Michelle"), Manuel's wife, was registered to check into the hotel

again that night.  Agent Jason Weber, Drug Task Force Agent with the Richland County Sheriff's Office, testified that when he received the call from the hotel, he was familiar with the Quinteros. He told the hotel to contact his office again when the Quinteros checked back into the hotel.

The hotel called later in the day to advise the sheriff's office that Manuel and Michelle and two other females checked into the hotel.  Agent Weber asked the hotel to keep the Quinteros under video surveillance.  According to the date and time stamp on the security footage presented at the suppression hearing, surveillance began around 16:23 (4:23 p.m.) on September 15, 2009 (Defendant's Exhibit 2).

Three drug task force agents, including Agent Weber, arrived at the hotel at 9:45 p.m. that night.  The United States offered no explanation for the approximate 5 ½ hour delay between the time the hotel advised the sheriff's office the Quinteros checked back into the hotel and the officers' arrival at the hotel.  Security officers for the hotel told Agent Weber they believed two pickup trucks in the parking lot were associated with the Quinteros.  One of the task force officers ran the license plates of the trucks and they came back registered to a construction company.  A task force officer also walked a drug detecting dog around the trucks.  The dog did not "hit" on the trucks.  The officers thus believed the trucks were not involved in their investigation of the Quinteros.

At 10:26 p.m., the officers walked a K-9 unit outside Room 177, one of the two rooms associated with the Quinteros and their companions (Government's Exhibit 1).  The dog did not "hit" on the room.  At 10:33 p.m. the officers walked the K-9 outside Room 261, the room Manuel was staying in.  Id.  Once again, the dog did not "hit" on the room.   Agent Weber admitted at the suppression hearing that he did not have probable cause to enter the room, so he decided to conduct a "knock and talk".  The officers recorded the "knock and talk" on audio, which the Court admitted

into evidence at the United States's request.

    According to the recording, Agent Weber knocked on the Quinteros' hotel room door three separate times over the course of about 30 seconds.  After the third time, a male inside the room asked "Who is it?"  Agent Weber responded "security."  Outside the room stood Agent Weber, Agent Weber's partner, two hotel security officers, and an associate manager of the hotel.[1]

    A male answered the door and officers identified him as Manuel Quintero.  The lights were off in the room.  Manuel walked into the hall and told the officers there was a female in the room who is not dressed (Government's Exhibit 1).  At that time, Agent Weber commanded the female occupant, Michelle Quintero, to put on some clothes and step out into the hallway so he can talk to her.  Id.  While Michelle was getting dressed, Agent Weber advised Manuel the reason they were outside his room was because of the previous night and "some stuff" that was found in his room. Id. He asked Manuel if there was "anything in this room that shouldn't be in this room" also asked Manuel if he had any objection to the officers "just taking a look around" the room.  Id.  Manuel responded Michelle rented the room and did not give consent to allow the officers to enter the room.

    Despite Manuel's response, Agent Weber asked Manuel again if there was "anything in this room that shouldn't be in there" and whether he had "anything on [him], no knives, bazookas, guns or anything?"  Id.   While Manuel stood in the hallway and Michelle was in the room, one of the other officers suggested "Why don't we just see if we can just go in there and talk to her [Michelle] while she gets dressed?"  Id.  Agent Weber indicated he wanted to wait until Michelle got dressed and again called out to Michelle to see if she was dressed.  Id.  When Michelle said she was not

---

[1] The other officer with the Richland County Sheriff's Office returned the K-9 to his car and then joined up with the officers after they had entered the room.

dressed, Agent Weber directed her to get dressed so he can come in and talk to her.  A little while later, Agent Weber commanded Michelle to "just hurry up and get dressed."  Id.

After four to five minutes of directing Michelle to get dressed, Michelle came to the door and  said to the officers "You are scaring the shit out of me, what happened?"  (Government's Exhibit 1).  Agent Weber asked Michelle if she rented the room and then asked if they can come in. Id.  Michelle's response is inaudible on the recording.  At this point, Agent Weber told Michelle "We'll come in with you so we're not making a spectacle in the hallway." Id.  The officers, security guards, and associate manager of the hotel entered the room and turned on the lights.  Once they entered the room, Agent Weber testified the officers immediately began looking around the room visually.  After identifying themselves, Agent Weber asked Michelle if there is anything in this room that should not be in this room.  Id.  Michelle responded "no" and "not that I know of."  Id. He then asked Michelle if "she has any objection to us just taking a look around." Id.  Her response was ambivalent.  Agent Weber then told Michelle they have done so many searches that they have seen it all, and asked Michelle another time if she has any objection to them "just taking a look?"  Id.

 Agent Weber told Michelle the request to search stemmed from Manuel's room from the night before.  Agent Weber then advised Michelle"if there's nothing in here, then you shouldn't have a problem with it [a search], right? I mean if there's, if there's whatever, a small amount of marijuana in here, whatever, you need to be comfortable and just say . . . you don't have anything?" Id.  Michelle asked if she has a "right to ah" then said "I don't know" and then reiterated to the officers that they are "scaring the shit out of [her]." Id.  Agent Weber informed Michelle that he was not there to scare her but just there "to play it straight."  Id.  Michelle reiterated "you're scaring me." Id.  Agent Weber informed Michelle that he did not intend to scare her and once again asked

Michelle if she has any objections to the officers "just taking a quick peek around?"  Id.  Michelle finally agrees.

Agent Weber conceded at the hearing that he intended to conduct a thorough search of room, including the Quinteros' belongings, even though he told Michelle he just wanted to take a "quick peek" and to "just take a look around."  Id.  However, this intention was never made clear to Michelle.

While the officers were searching, Agent Weber informed Manuel he found a lightbulb in his room with meth residue on it, that the lightbulb had been dusted for fingerprints, and that the fingerprints from the lightbulb matched Manuel's fingerprints."  Id.   Agent Weber then inquired with Manuel about how his fingerprints got on the lightbulb.  Id.  Agent Weber admitted during the suppression hearing the lightbulb was never dusted for fingerprints and he misrepresented the evidence the officers had against Manuel.

While the search was taking place, Michelle interjected and told the officers "you can stop and get out of here." (Government's Exhibit 1).  Agent Weber agreed to stop the search but that the officers would not be leaving.   The officers had just discovered what appeared to be methamphetamine residue on a cellophane wrapper in Michelle's purse, which was inside a dresser drawer in the room.  The officers ceased searching and obtained a search warrant based on the suspected methamphetamine reside found in Michelle's purse and evidence seized from Michelle as part of a search incident to arrest.  Manuel moves to suppress all evidence seized during the warrantless search of the hotel room, the search incident to the Quinteros' arrest, and the search of the room pursuant to a warrant.

## LAW AND ANALYSIS

**1.      Standing**

The United States maintains Manuel lacks standing to challenge the search of Michelle's purse located in the hotel room.  Manuel contends that once the officers moved from the hall to the room, Manuel has standing to object.  A threshold issue the Court must decide is whether Manuel has standing to challenge the search of the room rented by his wife, Michelle.  See United States v. Perry, 548 F.3d 688, 692 (8th Cir. 2008) (district court properly denied motion to suppress when the defendant failed to establish he had standing to challenge the search of a third party's premises).

"Fourth Amendment rights are personal and cannot be asserted vicariously."  United States v. Pierson, 219 F.3d 803, 806 (8th Cir. 2000).  The Fourth Amendment protects individuals from warrantless searches in places where they have a reasonable expectation of privacy.  United States v. Molsbarger, 551 F.3d 809, 811 (8th Cir. 2009).  In order to have a legitimate expectation of privacy, a defendant must show (1) a subjective expectation of privacy, and (2) the expectation is objectively reasonable.  United States v. Williams, 521 F.3d 902, 906 (8th Cir. 2008).

A defendant moving to suppress evidence bears the burden of showing a legitimate expectation of privacy in the area searched.  Pierson, 219 F.3d at 806.  It is well-established that individuals have an objectively reasonable expectation of privacy in their hotel room.  Williams, 521 F.3d at 906.  The issue thus is whether Manuel has demonstrated a subjective expectation of privacy in the hotel room rented by his wife.  Perry, 548 F.3d at 691 (the defendant bears the burden of showing a subjective expectation of privacy).

Whether a person has a reasonable expectation of privacy in a hotel room depends on factors such as whether the person checked into the room, paid for the room, occupied the room, or had

personal belongings in the room.  United States v. Carter, 854 F.2d 1102, 1105 (8th Cir. 1988).  The

fact that Manuel did not rent the hotel room does not necessarily preclude him from having a

reasonable expectation of privacy in the room.  Williams, 521 F.3d at 906.  The hotel advised the

sheriff's office that Manuel and Michelle Quintero checked back into the hotel.  Surveillance video

from the hotel shows the Quinteros walking together to the room.  In response to knocking, Manuel

inquired who was at the door before he opened it.  When he answered the door at approximately

10:30 p.m., the lights were off in the room, indicating he and Michelle were likely sleeping.  Manuel

and Michelle are married.  The facts as presented indicate Michelle rented the room for the couple

to use jointly.  The Court finds Manuel has demonstrated a subjective expectation of privacy to

contest the validity of the warrantless search of the hotel room.

### 2.       Consent to Enter the Room

Manuel contends Michelle did not give the officers permission to enter the hotel room.  The

United States contends the officers' entry into the room was clearly consensual.

The Fourth Amendment prohibits a warrantless entry into a hotel room absent exigent

circumstances or voluntary consent.  United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997).

The United States bears the burden of proving to a preponderance of the evidence that the defendant

freely and voluntarily consented to the entry.  United States v. Golinveaux, 611 F.3d 956, 959 (8th

Cir. 2010).  The voluntariness of the consent is a question of fact to be determined from the totality

of the circumstances.  Id.

Manuel did not give the officers permission to enter the room.  Whether Michelle consented

to the officers' entry is a close call.  Compare United States v. Deanda, 73 F.3d 825, 825-26 (8th Cir.

1996) (a person who opens the door voluntarily or in response to a simple knock by police

knowingly exposes to the public anything that can be seen through the door thereby defeating any possible Fourth Amendment arguments) with Conner, 127 F.3d at 666 (an unconstitutional search occurs when four police officers positioned at or near the motel room door knock on the door longer and more vigorously than would an ordinary member of the public and gain access to the room in response to a demand under color of authority).

The officers knocked on the door three separate times over the course of about 30 seconds. Agent Weber represented himself as "security" in order to gain access to the room.[2]   After being told Michelle was naked, Agent Weber repeatedly commanded Michelle to get dressed, told her he wanted to come in and talk to her, and directed her to hurry up.  When Michelle arrived at the door, her first statement to the officers was "You are scaring the shit out of me, what happened?"  When Agent Weber asked Michelle if they can come inside, her response is unclear on the recording. Agent Weber next told Michelle "We'll come in with you so we're not making a spectacle in the hallway."  Id.  He then told Michelle he is going to turn on some lights in the room  Id.

It is unclear if Michelle invited the officers inside the room or if they just walked in because she did not object.   However, "[t]he precise question is not whether [Michelle] consented subjectively, but whether [her] conduct would have caused a reasonable person to believe that [s]he consented."  United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001) (citation omitted).  "Consent can be inferred from words, gestures, and other conduct."  Id.  In this case, Michelle was not sure about letting the officers into her room.   Agent Weber did  more than merely ask Michelle if he can enter, but he pressured her to get dressed so "I can come in and talk to you."  A few seconds later,

---

[2] Outside the door was Agent Weber and his partner, two hotel security guards, and an associate manager of the hotel.

he told Michelle again "we'll come in with you" and "We'll follow you in." During this time, not only was Agent Weber standing outside the door, but five other law enforcement officers or hotel staff were also standing outside the door.

Agent Weber's choice of words, demeanor, and conduct along with the number of people standing outside the door create doubt about whether Michelle voluntarily consented to the entry. Nevertheless, a reasonable person could believe Michelle impliedly consented by her actions. She did not deny the officers entry to the room with a clear verbal response or with a physical response such as closing the door. Once inside with the officers, Michelle voluntarily answered the officers' questions. She did not ask the officers to leave until after they discovered what appeared to be methamphetamine residue in her purse. Michelle's conduct could have caused a reasonable person to believe she gave the officers permission to enter the room. While the Court finds the issue to be a close call, after weighing all of the evidence, the Court finds a reasonable person could find Michelle consented to the officers' entry into the hotel room.

### 3.      Consent to Search

Consensual searches do not violate the Fourth Amendment because it is reasonable for law enforcement to conduct a search after they have been given permission to do so. Williams, 521 F.3d at 906. However, to justify a search based on consent, the government must prove the consent was voluntary. Florida v. Royer, 460 U.S. 491, 497 (1983). Consent is voluntary if given by free choice, rather than duress or coercion. United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006).

Factors relevant to the court's analysis include:

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also

important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

United States v. Arciniega, 569 F.3d 394, 398 (8th Cir. 2009) (citations omitted); see United States v. Moser, 240 F.Supp.2d 1068, 1075-76 (D.N.D. 2003).

Michelle was not called to testify. Little information is known about her age or mental ability. Agent Weber testified, however, that the Quinteros were known to law enforcement before the circumstances giving rise to this case. The Court is not concerned that Michelle lacked the ability to consent or did not understand the process. Instead, the Court is concerned about the timing of the investigation and the coercive manner in which the officers went about obtaining consent.

The hotel contacted Agent Weber to apprise him the Quinteros had checked into the hotel around 4:20 p.m. With no explanation for the approximate 5 ½ hour delay, the officers waited until 9:45 p.m. to go to the hotel. They did not try to make contact with the Quinteros until 10:30 p.m., when they first knocked on the hotel room door. Manuel answered the door after three rounds of knocking, believing "security" wanted to talk to him. The room was dark and Michelle was undressed. The undisputed evidence demonstrates the officers rousted the Quinteros out of bed, despite the Quinteros having checked into the hotel at 4:20 p.m.

The Court is mindful that nighttime searches are not per se unconstitutional. United States v. Harris, 324 F.3d 602, 606 (8th Cir. 2003); United States v. Berry, 113 F.3d 121, 123 (8th Cir. 1997). However, search warrants command the officer to execute a warrant during the daytime, unless the judge for good cause expressly authorizes otherwise. Fed. R. Crim. P. 41 (e). Daytime is defined as the hours from 6 a.m. to 10 p.m. Id. Here, the officers rousted two people out of bed

10

at night, without probable cause or a showing of good cause as to why they could not have acted earlier in the day.  They then pressured and interrogated the Quinteros to consent to a search at a time of the night that would not be permitted if the officers had obtained a warrant.  Indeed, it is a rare case in which law enforcement officers ought to be given more latitude to act when they do not have probable cause or exigent circumstances then the law allows when they do have probable cause or exigent circumstances exist.  Also, particularly troubling is the lack of any explanation as to why the officers waited for over five hours before they began their investigation at the hotel.

Moreover, it is clear the officers' conduct intimidated Michelle.  Six people were standing outside the door.  Before the entry, Agent Weber pressured Michelle; he commanded her to get dressed, he directed her to hurry up, and then he told her after she got dressed they were going to come into the room to talk to her.  Michelle told Agent Weber on three separate occasions that the officers were scaring her.  Yet, Agent Weber continued on with the same force and pressure.

Once inside the room, Agent Weber purposefully misrepresented his intentions with regard to the search.  He asked Michelle if the officers could "look around" or take "a quick peek around", knowing he intended to do more than just look around.  Agent Weber testified he intended to thoroughly search the room along with the Quinteros' belongings.  He also knew the only way he could search the room was to convince Michelle to consent.

It took several minutes of pressure by law enforcement officers to get Michelle to give the officers permission to look around.  The recording makes clear that Michelle's responses were ambivalent and made with hesitation and reservation.  Michelle was clearly nervous and scared and under pressure.  The audio recording also makes clear that the officers did not give Michelle a choice to consent to a search.  Consent obtained by duress or coercion is not voluntary consent.

11

Lakoskey, 462 F.3d at 973.

After considering and weighing all of the evidence, particularly the unexplained delay in arriving at the hotel, the time of night of the encounter, the number of officers involved, the pressure the officers put on Michelle, the coercive environment created by the officers, and the expressions of fear by Michelle, the Court finds the United States has not proven by a preponderance of the evidence that Michelle voluntarily consented to a search of the hotel room. Further, the United States has not contended exigent circumstances justified the search. Without consent to search or exigent circumstances, the law enforcement officers' search of Room 261 violates the Fourth Amendment and all evidence seized as a result of the room search must be suppressed.  See Conner, 127 F.3d at 666 (under the Fourth Amendment, a warrantless search of a hotel room requires consent or exigent circumstances).

Moreover, any evidence seized during the arrest of the Quinteros or pursuant to the subsequent search warrant for the hotel room must be suppressed as fruit of the poisonous tree.  See United States v. Alvarez-Manzo, 570 F.3d 1070, 1077 (8th Cir. 2009) (when a constitutional violation has occurred, evidence obtained by exploitation of the illegality must be suppressed).

## CONCLUSION

For the foregoing reasons, Defendant Manuel Quintero's motion to suppress evidence is **GRANTED**.  After the improper warrantless search of the hotel room, no evidence was presented to support a "break in the chain of illegality."   Since the evidence used to support the issuance of the warrant was obtained as a result of the improper search and the corresponding arrest of the Quinteros, all evidence seized as a result of the warrantless hotel room search, the arrest of the Quinteros, and the search of the room pursuant to the warrant is excluded from trial.

12

**IT IS SO ORDERED**.

Dated this 8th day of September, 2010.

/s/ Ralph R. Erickson
Ralph R. Erickson, Chief Judge
United States District Court